UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

JAMES JONES )
)
v. ) NO. 2:06-CV-290
)
AIG CLAIMS SERVICES, INC. )

## **MEMORANDUM OPINION**

Plaintiff's employer, Nuclear Fuel Services, Inc., purchased a group accident insurance policy for the benefit of its employees. The accidental death insurance policy was an "employee benefit plan" as defined in the Employee Retirement Income Security Act as codified in 29 U.S.C. § 1001, *et seq.* The plaintiff Mr. Jones elected, on behalf of himself and his wife, to enroll in the plan as beneficiaries. The accidental death policy was underwritten by AIG Life Insurance Company. AIG Claims Services, Inc. was the administrator of the plan.

Mrs. Jones died on September 21, 2003. Mr. Jones, claiming that his wife died as the result of an accident, filed a claim under the AIG policy. The plan administrator denied his claim, prompting Mr. Jones to seek judicial review pursuant to 29 U.S.C. § 1132(a). Both parties have moved for summary judgment on the basis of the administrative record. (Docs. 13 and 15).

Judicial review of a denial of benefits under an ERISA plan is *de novo,* unless the plan gives the plan administrator discretionary authority to determine eligibility for benefits, or to construe the terms of the plan. *Firestone Tire & Rubber v. Bruch*, 489 U.S. 101 (1989). It is undisputed that the plan administrator, AIG Claims Services, Inc., did *not* have discretionary authority to determine a beneficiary's eligibility for benefits, or to construe terms of the plan. Therefore, this court will review *de novo* the record upon which the administrator denied benefits to Mr. Jones.

The accidental death policy issued by AIG to Mr. Jones' employer contained the following pertinent provisions:

> **Accidental Death Benefit**. If injury to the Insured Person results in death within 365 days of the date of the accident that causes the Injury, the Company will pay 100% of the Principal Sum.
>
> **Injury -** means bodily injury caused by an accident occurring while this Policy is in force as to the person whose Injury is the basis of claim *resulting directly and independently of all other causes* in a covered loss.
>
> **Exclusions** - This policy does not cover any loss caused in whole or in part by, or resulting in whole or in part from, the following:
>
> * * *
>
>    (2) Sickness, disease or infections of any kind; except bacterial infections due to an accidental cut or wound, botulism, or ptomaine poisoning . . . . [Italics supplied].[1]

The policy's definition of Injury is incredibly awkward, but apparently no one disagrees regarding its intent: a death, to be covered by the policy, must be caused *solely* by an accident and nothing else may play a role, however minor, in the death.

All the facts, save the dispositive one, are undisputed. In 2003, Mrs. Jones was treated by Slonaker Medical Associates of Erwin, Tennessee for various ailments, including arteriosclerotic disease.[2] Slonaker's records also reflect that Mrs. Jones sustained a fall in April or May 2003 which caused her significant pain.[3] Slonaker's office note of May 7, 2003, indicates that Darvocet had not

---

[1] Record, p. 00018.

[2] R. p. 198, *et seq.*

[3] R., p. 203.

relieved her pain.[4]  She continued to complain of pain in her legs and back in July 2003.[5]  The doctor's note regarding a September 19, 2003, visit reflects that Mrs. Jones had been prescribed Darvon.[6]  In some way Mrs. Jones managed to obtain two separate prescriptions for Darvon, both of which she had filled.[7]  She died on September 21, 2003, while visiting relatives in Ohio.[8]

An autopsy was performed by the office of the Lucas County, Ohio Coroner on September 22, 2003.[9]  A synopsis of that autopsy is set forth in a "Case Summary On The Death Of Peggy Jones."[10]  First, the examining pathologists found that Mrs. Jones had relatively severe arteriosclerotic cardiovascular disease; the right coronary artery was 80-90% occluded, and the left anterior descending coronary artery was 50% occluded.  Secondly, a toxicology analysis of Mrs. Jones' blood revealed 1.6 mcg/ml of Propoxyphene in her blood, and 4.5 mcg/ml of Norpropoxyphene (the metabolite of Propoxyphene).  Propoxyphene is popularly known as Darvon, and Mrs. Jones had ingested an overdose.  Presumably in an effort to alleviate her pain, Mrs. Jones took enough Darvon that it reached toxic levels in her blood.  The autopsy report indicated that Mrs. Jones' "cause of death" was occlusive coronary artery disease which was "due to" arteriosclerotic cardiovascular disease. The report further stated that a "significant condition" was "combined drug

---

[4]*Id.*

[5]R., pp. 201, 203.

[6]R., p. 198.

[7]R., p. 186.

[8]R., p. 317.

[9]R. p. 263, 265, *et seq.*

[10]R., 265.

overdose" as a result of ingesting a combination of multiple prescription medications. The manner of death was reported to be an "accident."[11]

Mr. Jones filed a claim under the AIG Accidental Death Policy on the basis that his wife's death was due to an accidental overdose of Propoxyphene. The plan administrator denied the claim, stating that Mrs. Jones' death was not the result of an injury that resulted "directly and independently of all other causes." In other words, AIG argues that Mrs. Jones occlusive coronary artery disease was the cause of her death, or at least contributed to it.

The plan administrator relies upon the autopsy report of the Lucas County Coroner's Office which says that Mrs. Jones died of occlusive coronary artery disease, and that the accidental overdose of Propoxyphene was merely a "significant condition." The plan administrator also relies upon the opinion of Dr. Joye Carter, a pathologist and "Forensic Consultant" who asserts that the overdose of Darvon only played an "accessory role" in Mrs. Jones' death.[12] In other words, Dr. Carter was and is of the opinion that the Darvon overdose may have been an exacerbating factor as far as Mrs. Jones' death is concerned, but it was not *the* cause of her death; rather, her death was the result of the occlusive coronary artery disease or, at the most, the combined result of the coronary artery disease and the drug overdose.

Mr. Jones relies on the Lucas County Coroner's Report to the extent that it recites that Mrs. Jones' death was accidental. He also relies upon the opinions of Dr. Shannon McCool, a pharmacologist; Dr. Joe Bailey, a cardiologist; and Dr. Cleland Blake, a pathologist, all of whom state with varying degrees of certainty that Mrs. Jones' heart stopped as a result of the Propoxyphene

---

[11] R., p. 265.

[12] R., p. 186.

overdose, and that her occlusive coronary artery disease had nothing to do with her death.[13]

As an initial matter, it is noted that the opinion of any one of these physicians and pharmacologists should not be given more weight than the opinion of the others in the sense that the opinion of a treating physician usually is accorded more weight than that of a physician who merely examines a claimant at the behest of a litigant. No one disputes the findings of the two autopsy examiners, *viz*, that Mrs. Jones had two arterial blockages as described in the autopsy case summary and that her blood contained 1/6 mcg/ml of Propoxyphene. Rather, it is the conclusion that should be drawn from those findings that is vigorously disputed by these extremely competent professionals: Was Mrs. Jones' death caused *solely* by the accidental overdose of Darvon, or did her occluded coronary arteries, *to any extent whatsoever*, contribute to her death?

The burden is upon Mr. Jones to prove that his wife's death resulted from an accidental overdose of Darvon, and that no other cause contributed to her death. *Smith v. Life Ins. Co. of North America*, 872 F.Supp. 482 (W.D. Tenn. 1994), and cases cited therein.

Dr. McCool, the pharmacologist, noted that Mrs. Jones had toxic and lethal levels of Propoxyphene in her blood[14] and went on to describe how an overdose of Propoxyphene can kill:

> 3. Such a drug overdose can cause hypotension and depressed respirations (hypoxemia), both of which can lead to increased in cardiac demand for blood and oxygen.
>
> 4. The hypoxic potential of the Propoxyphene/norpropoxyphene due to respiratory depression and compounded by sleep (which is a hypoxic condition naturally) and the inherent arrhymogenic [sic: arrthymogenic] potential of the

---

[13]Dr. McCool: R., p. 474-475.
 Dr. Bailey: R., p. 146-154.
 Dr. Blake: R., p. 88.

[14]R., p. 474.

5

norpropoxyphene are the prime causes of this sudden death in her sleep.

In other words, Dr. McCool stated that the overdose of Darvon dangerously lowered Mrs. Jones' blood pressure and depressed her breathing, both of which placed increased demands on her heart for blood and oxygen.

Significantly, Dr. McCool went on to state in subparagraph No. 5

> Occlusive coronary artery disease/arterial sclerotic cardiovascular disease and/or severe occlusive coronary artery disease *is a likely aggravating factor* in that such prevents an increase in blood supply thus, leading to hypoxemia (i.e., demand exceeds supply).[15]

Dr. Bailey, a board-certified cardiologist, after reviewing the autopsy report, stated the following:

> While no one can absolutely deny the possibility that Ms. Jones succumbed to ischemic heart disease, there are enough irregularities that I would be less than enthusiastic about attributing her untimely death to coronary artery disease. Given her symptoms (as reported by family members), her final agonal aspiration of gastric contents, and her blood levels of analgesics, I would be more comfortable considering overdose as a likely possibility.[16]

Thus, at this chronological point in the process of plaintiff's claim, the two Ohio pathologists had flatly opined that Ms. Jones' death was caused by occlusive coronary artery disease, and that the drug overdose was a "significant condition." And although Dr. McCool stated that the drug overdose was the cause of her death, he also said that Ms. Jones' underlying coronary artery disease was a *likely* aggravating factor. This evidence falls short of proving by a preponderance of the evidence that Ms. Jones' death was attributable solely to an accidental overdose of Darvon. If anything, based on these reports, the evidence preponderates in favor of the administrator's decision.

---

[15]R., p. 475, italics supplied.

[16]R., p. 146.

6

Dr. Bailey's letter does not tip the balance of proof in plaintiff's favor; his opinion is equivocal.

Dr. Carter, who had been retained by the administrator, responded to the opinions of Dr. McCool and Dr. Bailey. In the course of her attempted rebuttal of Dr. McCool, Dr. Carter suggested that Mrs. Jones was a chronic user (abuser?) of Darvon and likely had developed a tolerance to Propoxyphene, from which she deduced that the levels of Propoxyphene in Mrs. Jones' blood actually were not lethal.[17] Plaintiff thereupon obtained a surrebuttal report from Dr. McCool, who went to some length to point out that the phenomenon of "tolerance," at least as it concerns Propoxyphene, refers only to the analgesic effects of the drug, not its toxic level.[18] There is little to no evidence to support Dr. Carter's conclusion that Mrs. Jones was an abuser of Darvon. Dr. Carter went out on a professional limb, and Dr. McCool sawed it off behind her. Apparently because she was stung by Dr. McCool's strong disagreement with her over the question of Mrs. Jones' tolerance to the toxic effects of Propoxyphene, Dr. Carter issued another report which suggested that Dr. McCool was not competent to express an opinion regarding Mrs. Jones' death because he was merely a pharmacologist, and not a medical doctor.[19] This statement understandably raised the ire of Dr. McCool, prompting him to question Dr. Carter's clinical expertise.[20]

There are several things about the subsequent reports of Dr. McCool and Dr. Carter which should be pointed out. First, Dr. Carter's suggestion that Mrs. Jones had developed a tolerance to

---

[17] R., p. 137.

[18] R., p. 124.

[19] R., p. 114.

[20] R., p. 100.

7

Propoxyphene had no factual underpinning and was scientifically questionable. Second, her reaction to Dr. McCool's response was petty, and Dr. McCool's counter-reaction was just as petty. Suffice it to say these subsequent warring reports provided much heat and no light.

Lastly, plaintiff procured the opinion of Dr. Cleland Blake, a pathologist of some renown in Tennessee. It is noted that Dr. Blake's report was submitted after plaintiff's claim was finally denied. Since this court may consider only the evidence that was available to the plan administrator at the time the final decision was made, *Miller v. Metropolitan Life Ins. Co.*, 925 F.2d 979 (6th Cir. 1991), the court may not consider the opinion of Dr. Blake. Dr. Blake opined that Mrs. Jones "degree of coronary artery occlusive disease . . . did not cause her death. In my opinion, her death is directly attributable to the pharmaceutical violations rather than to her coronary disease."[21] Even if the court should consider Dr. Blake's opinion, the court cannot say that it tilts the balance of the evidence in favor of plaintiff. The evidence simply does not preponderate against the opinions of the two pathologists who performed the autopsy that Mrs. Jones' death was due to coronary artery disease, to which the drug overdose was a contributing factor. As already discussed, this was also the opinion of Dr. McCool, although he felt that the primary cause of death was the drug overdose, and the underlying coronary artery disease was a "likely aggravating factor." But regardless of whether the coronary artery disease was the primary cause of death or merely the precipitating factor, the fact remains that the coronary disease contributed, to some extent, to Mrs. Jones' unfortunate death. Therefore, plaintiff's claim will be dismissed.

As a final matter, the administrator requested in its motion for summary judgment that it

---

[21]R., p. 88.

be awarded its attorney's fees and costs. The outcome of this case was by no means a foregone conclusion, and plaintiff's argument was not without logic or factual support. Defendant's demand for fees and costs will be denied.

An appropriate order will enter.

ENTER:

                                                             s/ Dennis H. Inman
                                                 United States Magistrate Judge